**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES,** | **08-CR-331 (VM)** |
| -against- | |
| **ASQUITH REID, et al.,** | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **Defendants.** | |

## INTRODUCTION

Having spent his life helping others, encouraging them, assisting them with money for school books and transportation, and being the inspiration they needed to succeed, Asquith Reid comes before the Court for sentencing on his conviction by pleading to the crimes of Conspiracy to Commit Mail Fraud and Witness Tampering. For those serious crimes he seeks clemency.[1]

Few people indeed have spent their lives and their treasure as consistently in the aid of others without regard for his own well-being as has Asquith Reid. Having lived an exemplary life for decades, Asquith Reid is a great deal poorer than he was before the commission of the crimes. Far from having enriched himself he, though not well off, has spent most of his savings aiding others, so that he is, at sixty-five, unemployed, convicted and ill, with a median life expectancy of four to five years according to his Oncologist. He is supporting his disabled wife of forty-one years, and one of his two surviving daughters.

This memorandum, supported by the heart-wrenching letters from people whose lives were inspired and enabled by Asquith Reid and backed by financial records, is written to assist the Court in imposing sentence.

---

[1] Mr. Reid obtained a contract from the City of New York by fraud, using the mails, and thereafter spent portions of the money received on improper, though charitable purposes, as described below.

The purposes of criminal sentencing are, generally, punishment, general deterrence, specific deterrence, and rehabilitation.

The question is what punishment is appropriate for a sixty-five year retired military veteran and technical worker who impoverished himself while spending the hours of his life working in his community, spending his own money on charitable purposes, as well as money that he obtained improperly from the City of New York, to help his neighbors, is not easy.

General deterrence, in this case, cries out against prison; Asquith Reid has been too good a citizen and too charitable a man for his past to be ignored and overridden in a bid to generate respect for law. The letters attached to this Memorandum as Exhibits 1-39 spell out, far more eloquently than can counsel, what sort of man comes before the Court for sentence.

Specific deterrence – incapacitating someone because they are a risk to the community – is wholly inapposite to this case.

Likewise Asquith Reid, having acted as a model in his private and in his public life for more than six decades, is not much in need of rehabilitation.

## I.   **Background**

Asquith Reid, then a union worker for International Brotherhood of Electrical Workers Local 3 ("IBEW #3"), founded the Donna Reid Memorial Education Fund (the "Donna Reid Fund" or the "Fund") in honor of his daughter Donna in 1988, after she, his first child, died from liver cancer the previous year. Mr. Reid, who himself initially survived a bout with prostate cancer in 1995 and is now suffering from a recurrence of that disease (even though his prostate was removed), established and used the Fund for fifteen years before he became involved with the City Council, to perform charitable activities in which he has been involved for many years, aiding his less-fortunate neighbors. He fought against the soul-numbing aspects of poverty, rallying his neighbors to organize, to educate themselves, and to become citizens. He established

2

after-school programs, and taught children in his own home, as well has hiring others to teach.

He would reach into his own pocket time and again to assist people in his community when they

needed help. As one neighbor wrote:

> He will help anyone with a meal who was hungry, rent money to
> avoid eviction, help to fill a Senior's prescription, pay the
> application fee to file for citizenship for an immigrant, funeral
> costs for families who could not afford to bury their dead or bail
> money to prevent a young person to spend [sic] time in jail while
> awaiting trial.  In fact there is nothing that Mr. Reid wouldn't do to
> help anyone who was in need.

Letter from Yvette Barrow, Exhibit 4.

Asquith Reid was born poor, and was raised poor.  His compassionate care for others is a

hallmark of the first sixty-five years of his life, and reflects how he was raised.

> He lived a simple life so that he can give to those who have
> nothing.  He lives in a modest home, always drives an older car,
> and dresses ordinarily.  As I taught him, God gives one a little
> more than they need, so that they can share with the less fortunate.
> I learned that from my mother and he learned it well from me.

Etta Reid (Mr. Reid's mother), Exhibit 27.

Asquith Reid was born in a board shack in Jamaica. His parents split up when he was five

years old. He was raised in a two-room shack with his mother, brothers, and sisters until he was a

teenager – without his father.  He came to the United States with his mother in 1963, joined the

Air Force that same year, and served the United States for four years during the Vietnam War.

In 1967 he became a United States citizen and was honorably discharged from the United States

Air Force.  He went on to work for a telephone company while simultaneously attending City

College at night, enjoying free tuition the first year and paying in full thereafter, when City

College was no longer free.

Asquith Reid attained his childhood aspiration of a Bachelor's degree in Electrical

Engineering, which he obtained in 1981, after seven years of college.  Asquith spend more than

twenty eight years as a Telephone Technician, and a proud member of Local 3 of the IBEW.  He has always lived extremely modestly and has present his income throughout the years aiding those people of his impoverished neighborhood of East Flatbush.  (See Exhibit 32, letter from his wife Dean Reid quoted at p. 11 below, explaining that, throughout their forty one years of married life, she and he have lived extremely modestly so that poorer neighbors would not have to do without necessities.)  He repeatedly assisted those in need whether the need be for school books or emergency funds; he was there to help his neighbors who were sometimes literally living hand-to-mouth.  Although assuredly not wealthy, Mr. Reid led an exemplary life, and even when he engaged in the conduct constituting the crimes to which he admits guilt, he did not enrich himself in doing so.  He spent his money, as he spent his time, in the assistance of others.

II.     **Mr. Reid is a Respected Member of the Community and has Devoted Himself to a Life of Community Service.**

Mr. Reid has had a profound impact on his family, members of his East Flatbush community and friends and relatives in his native Jamaica.  Thirty-nine of these people have written letters to the Court discussing the good works he did in the community, the personal impact that Mr. Reid has had on them, the impact that his daughter Donna's death had on him, the Fund he started in her name and his dedication to this family.  Many of the writers discuss Mr. Reid's focus on education as a means for self-improvement and several state emphatically that they would not have achieved their current levels of success were it not for Mr. Reid's encouragement of their elementary and high school educations.  Excerpts from these letters appear in the paragraphs below, and all of the letters are attached as Exhibits 1-39.  All of these writers urge the Court to be lenient and merciful to Mr. Reid.

Cislyn Boucher, a neighbor and colleague, wrote about Mr. Reid's involvement in local organizing in East Flatbush and also Donna Reid's death (Exhibit 5):

He visited many block association meetings encouraging the
members to be more active in their community and to work
together to improve where they live.  He would always encourage
and assist residents in big buildings to form tenants associations so
that their voices could be heard.

\* \* \*

Asquith loves children dearly and was always ready to help.  Thus
when his daughter died he created an organization in her memory.
It was the intent of this organization to provide assistance to
educating children who needed help but could not afford it.  This
organization provided free after school help, computer classes and
summer classes as well as GED classes.

The effort to obtain computers for the poor of East Flatbush was part of Mr. Reid's focus

on education, so was his provision of after-school help, something any working parent can

appreciate.  Donald Miles noted the reasons Mr. Reid formed the Donna Reid Fund and the work

Mr. Reid did through the Fund and outside of it as well (Exhibit 18):

Through his organization, Donna Reid Memorial, he offered
homework help to the children whose mothers could not pay to
send them to other places.  This was for the entire year, even in the
summer parents could depend on this program to send their
children to Mr. Reid was very much involved in his community.
He was always at funerals, visiting the sick in their homes,
attending community meetings and you could depend on Mr. Reid
to be there for you no matter what time of the day you called him.

Marrietta Small observes (Exhibit 37):

After his oldest daughter Donna died in 1987, he seemed to
become obsessed with changing conditions in the community.  He
became part of every fight for better education and quality of life
in . . . East Flatbush and Flatbush.  As a member of Community
Board 17 education committee, he immersed himself in education
causes.  He became PTA president of a Junior High and two High
Schools.

Narissa Joseph, herself from an immigrant family and a member of the New York and

New Jersey bars, attributes her success to Mr. Reid.  Ms. Joseph, who grew up in East Flatbush,

remembers Mr. Reid's encouragement of her education (Exhibit 15):

> Being an immigrant and the first person in my family to go into
> college it was difficult for me to understand the financial aid and
> application process. Mr. Reid helped me fill out the forms. Him
> and his organization took me and other students on college tours. I
> do not think I would be where I am today if not for Mr. Reid.
> While in college Mr. Reid continued to be a source of
> encouragement in [my] life.

Rabbi Pinchus Wechter, Dean of the Institute of Jewish Humanities, who is active in

interracial causes in Brooklyn, writes this of Mr. Reid's moral character (Exhibit 39):

> I have known Asquith Reid for the past ten years. He is a man
> who strongly believes in brotherhood, justice and dignity of man.
> He has fought hard to translate these principles into reality
> throughout his career as a community activist.

> Since he is a man of ethics, I know that he realizes his mistakes
> and I am sure that this will never be repeated.

> Throughout his life, Mr. Reid has brought wisdom, happiness and
> encouragement to people who sought his advice.

Yvette Barrow recalls all of the work that Mr. Reid has done to improve his

neighborhood (Exhibit 4):

> He is the main mover in the effort to organize all blocks and civic
> associations with in the 45th Council District.

> * * *

> Mr. Reid also helps to revive defunct organizations and forms new
> organizations to beautify the community . Helping the young
> children and seniors, accessing government services and in
> general, finding new ways to make each block better and more
> beautiful in the 45th District.

> * * *

> He will help anyone with a meal who was hungry, rent money to
> avoid eviction, help to fill a Senior's prescription, pay the
> application fee to file for citizenship for an immigrant, funeral
> costs for families who could not afford to bury their dead or bail
> money to prevent a young person to spend [sic] time in jail while
> awaiting trial. In fact there is nothing that Mr. Reid wouldn't do to
> help anyone who was in need.

Gail Reed-Barnett, an active member of the East Flatbush community writes about Mr.

Reid's tireless efforts (Exhibit 22):

> I can attest to Mr. Reid's continual dedication to our community,
> the education of our youth and the care for our seniors. As an
> educator, we worked on several projects to improve parental
> involvement and through elected officials, to provide the schools in
> the District with computers, air conditioning, science labs,
> libraries, newsletters etc.
>
> * * *
>
> I am proud to have Mr. Reid in our community and to work with
> such a dedicated individual. He is always ready to help. He never
> says no but he never asks for anything or any favors in return. He
> is always dependable.

Lloyd Roberts writes (Exhibit 33):

> For over three decades Asquith Reid has been an outstanding
> example of commendable citizenship in East Flatbush Brooklyn.
> His community involvement and contribution led to tangible
> improvement in the lives of East Flatbush residents.

Mr. Roberts then listed a series of community organizations, parent-teacher associations and the

like that Mr. Reid contributed to over the years as testament to his dedication to his community.

We note that a main characteristic of extreme poverty is that it deprives people of hope. Asquith

Reid acted throughout his life to create hope, to inspire others to act, and to assist them to

improve themselves, through education. Some of his help was public – but setting up a chalk

board in his home to assist children with their math homework was not. It was a reflection of his

values.

Albert Payne notes Mr. Reid's advocacy for improved educational opportunities in their

community (Exhibit 21):

> Mr. Reid has made a positive difference in CB17 and always
> represented the community well in his advocacy with all of the
> elected officials at the New [York] City, New York State and the
> Federal Government. Mr. Reid was a valuable member to our

team of five who for years advocated for the Postal Office at East
94th Street and Church Avenue. Mr. Reid was my trusted partner
in advocating with School District 18's Superintendant Harvey
Garner that resulted in Magnet School Programs for Public
Schools in East Flatbush/CB17. Today Mr. Reid's participation is
sorely missed.

Lloyd Brown, one of Mr. Reid's former co-workers when he worked for Local 3 recalls

Mr. Reid's professional reputation (Exhibit 7):

Mr. Reid has been a very dedicated worker. Whatever he is doing,
he makes sure to put his best effort to produce the best result
possible. He takes every opportunity to improve his knowledge
base and became expert at every type of equipment that we were
expected to work on. He even got a Bachelor of Science degree in
Electrical Engineering by attending college totally at night.

Mr. Reid was always friendly with all his coworkers and he never
had an altercation. When others refused assignments, he was ready
to accept. He was chosen as an "Essential Employee" by the
management.

Marjorie Silcott describes Mr. Reid's demeanor and manner of conducting meetings with

the goal of including and helping as many people as possible (Exhibit 35):

During club meetings, he would present the club with outreach
programs for the community such as educational programs for
senior citizens, lunch programs for those in need, & exercise
programs. Mr. Reid would also take time to explain to various
members of the community modes of public/private transportation
available for senior citizens, as well as for the physically &
mentally disabled. Asquith Reid was always very helpful to
members of the community. He was always helpful in trying to
solve any problems seniors may have and if he could not answer
any questions or concerns, he always referred people to someone
who may be of some assistance.

Kim E. Moment recalled his commitment and passion as well as Mr. Reid's generous

nature (Exhibit 19):

Mr Reid was very committed to the needs in our neighborhood.
He worked hard to make life better for many who resided there. I
have personally witnessed his brilliant intellect, his extraordinary
generosity to those in need and his passionate to service [sic] his

community.

* * *

He would reach into his pocket and purchase supplies for those
students who could not afford them.

Wellington Sharpe, a community leader whose state senate campaign Mr. Reid managed,

had the following observations about Mr. Reid's character (Exhibit 34):

He is . . . a good man whose charitable work in the community
greatly outweighs, in my view, the conduct of which he is charged,
and in which he engaged.  Mr. Reid will give his last dollar, if it
will make a child or an elderly person happy.

Adlin Gallimore offers these opinions of Mr. Reid's generosity (Exhibit 14):

Mr. Reid has always extended his assistance to anyone who
approached him.  He was very personal and [a] hard working
community member.  Mr. Reid is extremely family oriented.

Beverlie Sinclair writes (Exhibit 36):

He has always been a caring individual working for the best
interest of those around him and in his community.  Mr. Reid
frequently worked long hours and use[d] what ever time and
energy it takes to see those projects through.

I have gone to several Block Association Summer events for the
seniors, and children in the community, that would not have been
possible if it was not for the help of Mr. Reid, with his love and
ability to car[e] for people who at times are forgotten.

Mr. [Reid] is well known in his community as a loving, giving and
caring person, who would be greatly missed for all his loyalty and
service in the community.

Barrington Barrett offers these reflections on Mr. Reid's character (Exhibit 3):

Mr. Asquith Reid, in my estimation is an individual with a strong
sense of community responsibility and unique enthusiasm.  He has
demonstrated those qualities in all aspects of his community work.

Mildred Forde observes (Exhibit 12):

Mr. Reid is revered in Brooklyn for his leadership and involvement
in community activities.  Over the years, I have admired his

genuine concern and dedication to the youths of the community. Indeed, he has been an avid supporter of the Mildred Forde Enhancement Workshop often taking time out of his busy schedule to attend events.

Mary Morrison writes (Exhibit 20):

> He is honest, trustworthy, kind and understanding. He has been an outstanding human being.
>
> His character is excellent and I would vouch[] for him that he would always be a trustworthy person in all his undertakings.

Omar Boucher notes (Exhibit 6):

> I know that Mr. Reid has undertaken several charitable projects to help children, the elderly, and the underserved both in the U.S. and in his home country of Jamaica, West Indies. He always has had a modest lifestyle and is always willing to assist others.

Elizabeth Lecky writes (Exhibit 17):

> I am one who look[s] to help the youths, the poor and the down-trodden, those who are society rejects. In so doing I found in Mr. Asquith. I could always call on him for help, financially or otherwise. He was always available to speak to the folks you need him to see and to give words of encouragement.

Coral Barnett discusses Mr. Reid's commitment to immigrant communities (Exhibit 2):

> Mr. Reid's dedication to the empowerment of the Caribbean community in Brooklyn has been exemplary. Because of his dedication and commitment and through his social and political involvement he had become well known in our community.

Sherif Fraser, District Manager of Community Board #17, notes that (Exhibit 13):

> Mr. Reid has been an important key in recognizing and implementing solutions to some major issues in the East Flatbush community  He exhibited a talent for decisive and positive leadership.
>
> * * *
>
> It has been a great pleasure to work with Mr. Reid over the years on behalf of this Board and the community it serves. His contribution has most certainly assisted the Community Board in accomplishing some of their goals of helping those most in need.

10

Mr. Reid has the support of his mother, wife, daughters, brothers, sisters and nieces and nephews, several of whom have written on his behalf.  Those letters are excerpted below.  His wife Willie "Dean" Reid writes passionately about her husband of forty-one years and how he has lived his life (Exhibit 32):

> His charitable ways has meant that our family had a very simple way of life and lack the nicer things.  Despite that, I have not got upset with him because that is the way that he was brought up.  He promised to buy our first new car if it's the last thing he does. [2]  I support him wholeheartedly because his deeds have been an example to our children and all children who have been fortunate to share his friendship and counsel.

His 87 year-old mother Etta Reid recalls Mr. Reid's work ethic, discusses the impact his incarceration would have on her and mentions his modest lifestyle (Exhibit 27):

> Even while working and attending college at night he still found time to help those in need.  So it is no wonder that after graduation, he immersed himself into his community, trying to make it a better place.
>
> * * *
>
> I was 87 years old last December.  I can't stop crying at the prospect that I may not see my boy again before I depart this earth.
>
> * * *
>
> He lived a simple life so that he can give to those who have nothing. He lives in a modest home, always drives an older car, and dresses ordinarily. As I taught him, God gives one a little more than they need, so that they can share with the less fortunate. I learned that from my mother and he learned it well from me.

His daughter Sharon discussed how important Mr. Reid is in his grandchildren's lives and the values that motivate her father's life (Exhibit 31):

> Asquith Reid is very active in his grandchildren's life.  He helps them with their homework.  He also takes them to school in the

---

[2] Mr. Reid has not yet fulfilled his promise to his wife to purchase a new car; they have only driven used cars.

> morning.  He attends Parent Teacher Conferences and any other
> activities that they have at school.  He also attends out of school
> activities.
>
> * * *
>
> As a child I remember my father telling me and my sisters that it is
> important for us to give back to our community and to give to
> people who are less fortunate than we are.  He did not only speak
> those words to us, but he lived them as well.

Desmond Reid, Asquith's brother, recalls the pain of his niece's death and how it affected

Asquith (Exhibit 26):

> When his daughter died of cancer, at the age of 18, he decided to
> set up a foundation in her honor and help others who are in need.
> We agreed that education was the best means of pulling oneself up
> from the lower levels of life and so he set up a homework help
> center, beginning in his home.

Ridley Reid, Mr. Reid's brother, recalled Mr. Reid's life-long love for technology and

how it inspired all of them (Exhibit 30):

> When he was only 16 years old he sent here to the U.S. to get a
> radio set, which he put together, and it actually worked, can you
> imagine the excitement, the pride, and admiration the boys had in
> their older brother?  During the years ahead we all watched
> Asquith , always helping others.  When we migrated to the U.S. he
> continued his quest.

His sister Marilyn Reid notes Mr. Reid's health status and expresses her concerns about

recent deaths in the family (Exhibit 29):

> I have much concern about my brother's health, at this point.  In
> addition to his own health problems, he is also dealing with the
> health of his immediate family.  Also, in recent months, we have
> dealt with the death of a brother, father, three uncles and nine other
> relatives.  Due to his travel limitations, he was unable to attend any
> of their funerals.  All of this has taken a great toll on him.

Clifton Reid, another of Mr. Reid's brothers who is the primary caregiver for their

mother, observes (Exhibit 23):

Asquith is actually a quiet, retiring person who nevertheless saw a
need and many years ago, answered the call to community and
public service.  His life in itself has reflected a genuine
commitment to helping fix problems in the communities as well as
in the lives of many individuals around him.  The illness and
untimely death of his daughter Donna some years ago made him
even more acutely aware of the pain that many people experience
on different levels, and further strengthened his resolve to do what
he could to help people cope with their suffering, and improve
their lives.

I believe that people who actually know Asquith and are familiar
with his work will agree that he has been a tremendous force for
good over a long period of time.

In his letter, Mr. Reid's nephew Desmond Reid, Jr., now a lieutenant colonel in the

United States Marine Corps, recalled his uncle's dedication to his education and also the impact

of his cousin Donna's death on his uncle (Exhibit 28).

On weekends and after school, Uncle Asquith tutored me and
many other local kids in math and science skills.  He taught me
basic mathematics and algebra and helped me with projects for the
school science fair.  He spent hours drilling me, answering my
questions and ensuring I had a solid foundation of knowledge upon
which to build.  He committed himself to my achievement over a
period of years; I could not have succeeded in my current
technically-challenging military career without Uncle Asquith's
instruction and mentorship

* * *

He was visibly changed in the aftermath [of his daughter Donna's
death]; it is my opinion that he struggled to recover over many
years, and that he did so, in part, through his service to the
community.

Audrey Fagan Reid, Mr. Reid's sister-in-law, and Desmond Reid, Jr.'s mother, agrees

with her son as to the positive impact her brother-in-law had on her son's life (Exhibit 11):

As a mentor, Asquith has tutored several youngsters who fell a
grade behind or would not have graduated, but with his help went
on to graduate.  To Asquith education is very important.  He would
tell this to all his nieces and nephews and would help them in any
way possible to achieve their educational goals.  One year, he

helped my son Des with a science project that placed third.
However, between the two of them the reworked the project to
make it better: this to demonstrate to Des that he should not settle
for third place. This helped Des to strive to be the best he can
become: Des went on to win scholarships and graduated top of his
class.

Mr. Reid's nephew Dane Reid shares memories of Mr. Reid opening his house to his

nephew when he was a boy and Mr. Reid's dedication to his causes (Exhibit 25):

My relationship with Uncle Asquith has always been one of trust
and respect. Throughout my life his home has always been a
second home of mine. Growing up my parents worked long hours
in their own business and I spent much of my time at his house.
My uncle worked many years as an electrician for a telephone
company. He would come home after work, eat and check on the
family before he left again to volunteer his time in the community.

Two of the schoolchildren that Mr. Reid has assisted over the years provided letters to

assist the Court in understanding the conditions in which they live and how Mr. Reid's financial

help is providing them with avenues to lift themselves and their families out of poverty.

Francine Washington in Jamaica wrote about the practical assistance Mr. Reid provided her and

her family (Exhibit 38):

I am from a very poor family. My sister and I had to stay home
sometimes two or three times a week at times because we did not
have the money for bus fare and lunch.

* * *

Mr. Reid helped to build a bathroom so that we do not have to
walk far to get to the public toilet. I stay with one of my Teachers
and Mr. Reid helps with lunch money so that I can go to school
every day. He encourages me to concentrate on my education. For
the first time in my life I know that I can realize my dream of
becoming a teacher.

Shelly-Ann Earle, who lives in Jamaica with her family, also has received assistance

from Mr. Reid so she can get an education (Exhibit 10):

> I met Mr. Reid when I was thirteen years old because I was his
> cousin's schoolmate. He helped me when my mother could not
> afford to find bus fare, lunch money and books to send me to
> school. I know that for many years he helped a lot of children to
> enable them to go to school. Some of them graduated and find
> jobs to send their younger brothers and sisters to school.
>
> He helped us repair our roof to keep out the rain and helped my
> friend's family when their house burned down.

Asquith Reid attempted to establish various educational programs, to assist people to

learn to read, to assist them to become citizens, and to take care of children after school. He

spent his own funds and City funds on those projects, and was, before his arrest, in debt on his

house, having sold his securities. He lives quite modestly still; he supports his wife who is

medically unable to work and a daughter Michele, in a very poor section of New York with no

trappings of wealth. At age sixty-five he has little in the way of material goods, and has, by his

conduct, brought shame on himself, his family, and his daughter Donna.

Mr. Reid suffers from serious health problems. In 1995 he was diagnosed with prostate

cancer. After his prostate was removed and his cancer went into remission Mr. Reid's health

continued to decline. He suffers from back pain, high cholesterol, and high blood pressure.

Then in early 2009 Mr. Reid learned that his cancer had returned. In the last six months he has

undergone an intensive course of radiation treatment in an effort to fight this potentially fatal

disease. According to his doctor, Mr. Reid suffers from a type of a cancer that has a high

probability of relapsing. (If incarcerated this aggressive form of cancer would cause Mr. Reid's

health to deteriorate further.)

He has no prior criminal history and prior to this offense, he has worked steadily since

leaving the Armed Forces. Mr. Reid does not present a risk to the public.

III.   **STATUTORY STANDARDS**

The letters addressed to the Court describe Mr. Reid's character and the positive impact

he has had in the community, his native Jamaica and his family.  They provide context for the

Court to understand who Mr. Reid is, in spite of the conduct that resulted in his guilty plea.  In

his allocution, Mr. Reid admitted that he falsely designated the subcontractor who would receive

wages under the Donna Reid Fund's contract with the City because the actual subcontractor was

ineligible to work on City contracts.  The money allocated in the contract went only in part to

her; the remaining funds were divided between the nominee and Mr. Reid.  Transcript of Plea

Hearing (June 25, 2009), at 16:22 – 17:25.  The statutory standard for imposing sentence is set

forth at 18 U.S.C. § 3553(a) which states:

> The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining particular sentence to be imposed, shall consider—
>
> 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> 2.   The need for the sentence imposed—
>
>> A.   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> B.   to afford adequate deterrence to criminal conduct;
>>
>> C.   to protect the public from further crimes of the defendant; and
>>
>> D.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner.
>
> 3.   The kinds of sentences available
>
> 4.   The kinds of sentence and the sentencing range established for—
>
>> A.   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>>
>>> i.   issued by the Sentencing Commission pursuant to section

994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    ii.    that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

    B.    in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

5.    Any pertinent policy statement—

    A.    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    B.    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

6.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.    The need to provide restitution to any victims of the offense.

Following the United States Supreme Court decision in *United States v. Booker,* 543 U.S. 220, 246 (U.S. 2005) the Federal Sentencing Guidelines are no longer mandatory and instead became advisory. The sentencing court is now required "to consider Guidelines ranges, but [the federal sentencing statute] permits the court to tailor the sentence in light of other statutory concerns as well." *Id.* (citing 18 U.S.C. § 3553(a)). "To sentence in compliance with *Booker*, the court is constrained to consider the sentencing factors set out in 18 U.S.C. § 3553(a)." *United*

*States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009). When sentencing a defendant post-*Booker* the court has much greater latitude in its sentencing decision:

> [I]n accordance with Booker and with the mandate of 18 U.S.C.
> § 3553(a), a district court must consider a variety of factors in
> imposing a sentence, including, (1) the nature and circumstances of
> the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed [to satisfy certain articulated
> purposes] . . .;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable
> category of defendant as set forth in the guidelines . . .;
>
> (5) any pertinent policy statement . . . [issued by the Sentencing
> Commission];
>
> (6) the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of
> similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

*United States v. West*, 383 F. Supp. 2d 517, 519 (S.D.N.Y. 2005).

Applying all of these factors, sentencing Mr. Reid to probation would constitute "a sentence sufficient, but not greater than necessary to comply" with the sentencing objectives of 18 U.S.C. § 3553(a).

## A.    OFFENSE CONDUCT

On June 25, 2009 Mr. Reid, former chief of staff to New York City Council Member Kendall Stewart ("the Council Member"), pled guilty to one count of violating 18 U.S.C. § 1341 for conspiring to commit mail fraud by misappropriating a portion of the discretionary funds the Donna Reid Memorial Education Fund ("Donna Reid Fund" or "the Fund") and Central Brooklyn Community Services ("CBCS") received from the City of New York, and submitting written confirmations through the mail regarding wire transfers of those funds. He also pled

guilty to one count of violating 18 U.S.C. § 1512(b)(1) for tampering with a witness by asking a witness who had received a grand jury subpoena to misstate her involvement in the Donna Reid Fund.

Specifically, Mr. Reid obtained a contract for the Donna Reid Fund by deliberately misstating the identity of a subcontractor who was not able to work in the United States because of her immigration status. As a result of Mr. Reid's misstatement, the Donna Reid Fund was reimbursed for the project with funds that it would not otherwise have been eligible to receive. Of the monies paid by the City of New York to the Fund, $14,000 was paid to and retained by the undocumented subcontractor. Mr. Reid also wired approximately $31,000 to support impoverished family and friends in his native country of Jamaica.

Mr. Reid routinely spent his own money to finance the Fund's projects. When he received discretionary funds from the City he believed he was entitled to a substantial portion of those funds as reimbursement. Unfortunately he did not keep complete records of the expenses he paid out of pocket to finance the Donna Reid Fund's projects. The difference between Mr. Reid's documented expenses and the amount of money wired to needy recipients in Jamaica may represent a loss to the city. With respect to the 18 U.S.C. § 1512(b)(1) violation, after an investigation had commenced into the Fund's books, Mr. Reid asked a witness to misstate her involvement in the Donna Reid Fund.

**B.     SPECIFIC OFFENSE CHARACTERISTICS**

**1.     The Loss Amount Has Been Incorrectly Calculated**

The Presentence Report concludes that the total loss amount to New York City caused by Mr. Reid and his co-conspirators is $145,000. (Presentence Report p. 7.) This loss amount, more than $120,000 but less than $200,000, would result in a ten-level increase of Mr. Reid's base offense level. U.S.S.G. § 2B1.1(b)(1)(F). However, the Presentence Report's calculation

of the loss amount is inaccurate; and the loss amount significantly lower, resulting in a lower increase in the offense level.

The Sentencing Guidelines offer very little guidance on the correct method to calculate actual loss. U.S.S.G. § 2B1.1 Application Note 3 provides "loss is the greater of actual or intended loss." "Actual Loss" means the reasonably foreseeable pecuniary harm resulted from the offense. "Intended Loss" means the pecuniary harm that was intended to result from the offense. In applying § 2B1.1 courts have used the Guidelines' definition of loss and held that "[i]n cases involving fraud, a 'district court may presume that the defendant intended the victims to lose the entire face value of the [fraudulent] instrument, but the defendant may rebut the presumption by producing evidence to demonstrate that he actually intended to cause a lesser loss.'" *United States v. Uganda Nash*, 2009 U.S. App. LEXIS 16667 *3 (2d Cir. July 29, 2009) (quoting *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008)); *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (remanding to allow defendant "an opportunity to persuade the sentencing judge that the loss he intended was less than the face amount of the [fraudulently obtained] loans."); *see also United States v. Kirincic*, 2007 U.S. Dist. LEXIS 80146 *6-7 (S.D.N.Y. Oct. 29, 2007) (using actual loss to determine the increase to defendant's base offense level and finding that "[u]nder U.S.S.G. § 2B1.1, . . . intention governs. The government has not shown that the defendant intended a loss greater than the actual loss."); *United States v. Ankamah*, 2004 U.S. Dist. LEXIS 5816 *6 (S.D.N.Y. 2004) ("[t]he Government bears the burden of proving the intended loss amount by a preponderance of the evidence.").[3] In calculating the total loss amount the Presentence Report merely lists various dollar amounts of checks Mr. Reid

---

[3] The government does not appear to take the position that all of the Donna Reed Fund contracts were obtained by fraud and, therefore, represent the loss amount. Instead the government has attempted to calculate the amount of loss to the City, however it has overstated this amount.

cashed or funds Mr. Reid used for purposes not deemed legitimate. When properly calculated neither the actual loss amount nor the intended loss amount approaches $145,000.

Mr. Reid did not think he was causing a "loss" even when he hired an undocumented person whose identity he had to conceal, with the attendant deceits about the money flow. He did not intend to misappropriate any funds from the Donna Reid Fund or CBCS. Both organizations were created to provide much needed services to the community. When Asquith Reid founded the Donna Reid Fund in the memory of his deceased daughter, he personally provided virtually all of the financing for the organization's projects for years before he got involved in the events which brings him before the Court. The City of New York does not provide prospective funding to these types of non-profit organizations, instead it reimburses organizations for labor and supplies. This means that an organization must advance money; Asquith Reid advanced funds to the Donna Reid Fund but then reimbursed himself. This is evidenced by the fact that he used significant sums of personal funds to finance the organizations and that at the end of the alleged scheme Mr. Reid was actually poorer than he was before the period described in the indictment.

The Presentence Report puts Mr. Reid's actual loss at $145,000. Because the system only reimburses contractors for expenses incurred, the loss to the City must mean any amount of money that Mr. Reid took from the Donna Reid Fund less any money that he contributed to the Fund. Mr. Reid contributed at least $100,000 to the Fund – money for which he is entitled to be reimbursed. This $100,000 does not represent a loss to the City because only money over and above what he was entitled to receive can be construed as a loss. *United States v. Parsons*, 109 F.3d 1002, 1004-1006 (4th Cir. 1997) (remanding for a revised loss calculation because the loss

attributable to defendant should be limited to money obtained in excess of the amount to which the defendant was lawfully entitled).

Mr. Reid agrees, with remorse, that he misstated the identity of a subcontractor used by the Donna Reid Fund because she was an undocumented immigrant. Mr. Reid knowingly and improperly but understandably, named a nominee as the subcontractor. The nominee received $22,000 in salary of which she retained approximately $8,000 and Mr. Reid paid the undocumented immigrant approximately $14,000.

The Presentence Report concludes that Mr. Reid and his co-conspirators cashed more than $73,000 in checks issued to the Donna Reid Fund. (Presentence Report p. 7). However, the report fails to take into account those legitimate expenses for which he was entitled to be reimbursed. Because New York City does not fund projects on a prospective basis Mr. Reid was forced to finance the Donna Reid Fund's projects then seek reimbursement from the City. Regrettably Mr. Reid did not maintain adequate records of all of the Fund's expenditures. The United States Attorney's Office has prepared bank records and schedules that establish that Mr. Reid was entitled to receive a substantial portion of the discretionary funds as reimbursement. *See* Schedules of Donna Reid Fund Bank Accounts, attached as Exhibits 41 and 42.

The Presentence Report determines that Mr. Reid wired $31,000 to friends and relatives in Jamaica. This allegation is regrettable, but true. However, while this money was used for purposes other than what the City contract with the Donna Reid Fund intended, the simple fact is that Mr. Reid did not enrich himself with these funds. The money was used for school uniforms, for books and to build a two-room shack, such as the one Mr. Reid grew up in.

Finally, the report concludes that Mr. Reid used approximately $18,000 of the discretionary funds to pay for events for a political club controlled by the Council Member and

$3,000 of the funds were used to pay for the Council Member's campaign literature. That allegation wholly lacks merit. The $21,000 was all repaid, by one transfer the same day, and one transfer within a week. While Mr. Reid did write checks from the Donna Reid Fund's account on June 15, 2004, totaling $11,752.00 to pay for a political event at the Grand Prospect Hall, bank records show that the day before, but before the checks could clear, the exact same amount of money was deposited into the Fund's account by means of two checks drawn on accounts held by Cislyn Boucher ($6,000) and "Wesley McDonald Holder Regular Dem. Club, Inc." ($5,752.00). On May 17, 2005, almost one year later, Mr. Reid wrote check #287 in the amount of $6,652.00 to the Grand Prospect Hall from the Fund's account. On May 23, 2005, $10,700 in cash was deposited into the account to reimburse the Fund for this expense. Bank records and schedules prepared by the United States Attorney's Office support Mr. Reid's claim that the Fund was reimbursed for the expenditure and that no City money was lost to political expenses. *See* Exhibits 41 and 42. If the Government were to claim that the repayments as cash came from City funds, which are part of the $73,000 in checks cashed, then, that $21,000 still ought not to be counted since it has already been identified as money that Mr. Reid improperly obtained from the Donna Reid Fund. The funds that constitute the loss amount cannot be double counted.

Taking into account the legitimate expenses to which Mr. Reid was entitled to be reimbursed the actual loss is less than $50,000. We reach that conclusion by taking the $145,000 alleged, minus the approximately $100,000 Asquith Reid put into the Donna Reid Foundation. Since the actual loss is more than the intended loss, the actual loss amount, *i.e.* less than $50,000, should be used to determine the level under § 2B1.1(b)(1) and not the miscalculated loss of $145,00 as concluded in the Presentencing Report. Using the correct loss amount Mr. Reid's base offense level should only be increased by six levels as provided by § 2B1.1(b)(1)(D).

**2.** **Reid Does Not Qualify for an Increase Based on Abuse of a Position of Trust**

Pursuant to Section § 3B1.3 of the Sentencing Guidelines the Presentence Report adds two levels to Mr. Reid's base offense level on the grounds that Mr. Reid abused a position of trust in the commission of his 18 U.S.C. § 1341 violation. (Presentence Report p. 11.) Sentencing Guideline § 3B1.3 Application Note 1 states that for "this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense." In determining whether the § 3B1.3 level enhancement applies "[t]he common thread in [the] cases is the extent to which the position provides the freedom to commit a difficult-to-detect wrong rather than a legally defined duty." *United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999) (internal citations omitted).

Mr. Reid served as the Chief of Staff to New York City Council Member Kendall Stewart. His creation of the Donna Reid Fund and CBCS from which he is accused of misappropriating funds, had no relation to his position as the Council Member's Chief of Staff. As discussed above, Mr. Reid created the Donna Reid Fund in 1988 to honor the memory of his daughter, who at just eighteen years of age, died of liver cancer that year. It was not until January 2002, more than ten years after the Fund was created, that Mr. Reid began working as Council Member's Chief of Staff. And it was not until 2004 that the Fund began to receive funds from the City of New York. Before he became Chief of Staff, Mr. Reid was a widely respected philanthropist and community activist in his Council Member's district. A request from him for funds would of course have been accepted by his Council Member.

The discretionary funds allocated by the New York City Council to fund non-profit organizations are apportioned amongst the Council's members. Each council member controls his or her allotted portion of the funds. Contrary to Paragraphs 15, 17 and 32 of the Presentence

Report, Mr. Reid had no decision-making power in determining which organizations received discretionary funds.[4] In his former position Mr. Reid was responsible for managing the Council Member's district office, greeting constituents and serving as a liaison between the office, the City and the community in obtaining official resources. The Council Member made all of the decisions regarding requests for discretionary funds including which organizations received money, how much they received and how the funds were allocated. Mr. Reid was not part of the legislative committees responsible for approving funding requests. In no way did his official position facilitate his alleged misappropriation of funds from the Donna Reid Fund: His role in the community is what enabled the applications.

Courts have observed that having a position within a government body is not necessarily sufficient to warrant application of the adjustment: "[o]pportunity and access do not equate to authority, or to the kind of substantial discretionary judgment that is ordinarily given considerable deference." *United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003) (internal citations omitted). Mr. Reid's position did not afford him any special freedom or advantage when applying for discretionary funds. The Donna Reid Fund did not receive discretionary funds directly from the Council Member, but applied for funds through two New York City agencies. Further proof that Mr. Reid's position did not significantly contribute to the Fund's receipt of discretionary funds is evidenced by the fact that the Donna Reid Fund's first application for discretionary funds was denied.

In applying § 3B1.3 courts have also "use[d] the perspective of the victim to determine whether a defendant was in a position of trust." *United States v. Barrett*, 178 F.3d 643, 646 (2d

---

[4] We ask the Court to disregard completely the allegations in Paragraphs 3-5 of the Superseding Indictment regarding the City Council's habit of lying to the citizens of New York about the budget. The "holding codes" were the purview of the Majority Leader of the Council, not the staff of particular Council Members.

Cir. 1999). The victim here is the City of New York. Viewing the crime from the perspective of the victim, it is clear that Mr. Reid was not perceived as a being in a position of trust within the City's ranks. New York City provided the funds to the City Council who in turn allocated a portion of the discretionary funds to the Council Member. Mr. Reid was not part of the legislative process and did not have authority to make decisions regarding the discretionary funds. In order to receive funding the Donna Reid Fund had to apply for money through the same process used by all recipients of discretionary funds.

Based on the foregoing factors, a two level increase in Mr. Reid's base offense level for abusing a position of trust is not warranted.

**3.    The Objectives of § 3553(a) Would Be Best Satisfied by a Sentence of Probation**

After *Booker* a sentencing court is empowered to create a sentence that takes into account the defendant's unique facts and circumstances; "[s]ince Booker, the Guidelines are no longer a straight-jacket binding courts to artificially created and cruel paradoxes of sentencing . . ." *United States v. Hawkins*, 380 F. Supp. 2d 143, 161 (E.D.N.Y. 2005); *United States v. K*, 160 F. Supp. 2d 421, 437 (E.D.N.Y. 2001) ("It has been suggested that the Guidelines themselves are only one factor to be considered with the others, including rehabilitation, set out in section 3553(a)"); *see also United States v. Neiman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993) (departing from the sentencing guidelines and noting that "Congress has directed that in addition to deterrence and prevention of further crime, an objective of sentencing be providing the defendant with . . . correctional treatment in the most effective manner.") (internal citations omitted).

The first factor the court should consider pursuant to § 3553(a)(1) is "the nature and circumstances of the offense and the history and characteristics of the defendant." By all indications, the conduct described in the indictment notwithstanding, Mr. Reid is an honorable

man and has led a commendable life of public service.  Prior to this offense he served as a leader in his community.  He used the Fund named for his daughter from which he is accused of embezzling, to provide money to those desperately poor in his neighborhood who did not even know how to apply to the federal, state, local and private relief agencies.  Mr. Reid spent a substantial portion of his modest personal income to finance the various programs and projects of the Fund, often emptying his personal bank account, borrowing the maximum limit on his credit cards, liquidating his stock portfolio, and refinancing his home.  When he reimbursed himself for the Fund's expenses he did not pay off his credit card debt, pay down his mortgage or rebuild his stock portfolio.  Instead Mr. Reid reinvested in the community using the money to help those in need to pay rent, buy books, pay immigration fees and feed their families.  A schedule demonstrating Mr. Reid's decline in net worth is attached as Exhibit 43.

In applying the factors enumerated in § 3553(a) the court must also take into account "the need to protect the public from further crimes of the defendant" and 18 U.S.C. § 3553(a)(2)(c). Mr. Reid is a sixty-five year old married man with two adult children and deep roots in the community.  He does not pose any additional threat to the public.  Mr. Reid's long standing commitment to his family and his age are evidence of that. *See United States v. Carmona-Rodriguez*, 2005 U.S. Dist. LEXIS 6254 (S.D.N.Y. Apr. 11, 2005) (rejecting the sentencing guidelines and noting that "[t]wo recent courts have declined to impose Guidelines sentences on defendants who, like [defendant], were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants").

Mr. Reid's co-defendant, Joycinth Anderson, similarly pled guilty to the charges against her.  She received a sentence of four months of home confinement and two years probation. While her role in the incident was less than Mr. Reid's, on balance, Mr. Reid's generally unsung

contributions to his community were far greater than one could reasonably imagine, and as a result he deserves a sentence as moderate as, if not more moderate than, Ms. Anderson's sentence.

### 4. Mr. Reid's Health Status Alone Warrants a Sentence of Probation.

When determining the defendant's sentence § 3553(a)(3) directs the court to consider "the kinds of sentences available." The non-violent nature of the offense combined with Mr. Reid's years of military service and lack of previous criminal history support a sentencing alternative to incarceration. "The current federal sentencing regime supports the utilization of alternatives to incarceration; specifically, pretrial diversion by federal prosecutors and sentencing alternatives to incarceration by judges, which include probation, home confinement, [and] electric monitoring." *United States v. K*, 160 F. Supp. 2d 421, 438 (E.D.N.Y. 2001). Given Mr. Reid's grave health condition a sentence of probation, home confinement and/or electronic monitoring would serve to punish Mr. Reid for his offense while enabling him to continue to receive the treatment necessary to fight his potentially deadly disease. *See United States v. Nellum*, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (sentencing defendant to a sentence lower than that provided by the guidelines and finding that "§ 3553(a)(2) and Booker, requires judges to impose sentences that . . . effectively provide the defendant with needed medical care.") (internal citations omitted).

After considering the factors set forth in § 3553(a) it is clear that a sentence of home confinement and/or probation would be more than sufficient to comply with the guidelines' sentencing objectives; "in addition to deterrence and prevention of further crime, an objective of sentencing be providing 'the defendant with . . . correctional treatment in the most effective manner.'" *Neiman*, 828 F. Supp. at 255 (S.D.N.Y. 1993) (quoting 18 U.S.C. § 3553(a)(2)(D)).

Finally, Dr. Bahaa Mokhtar, Mr. Reid's radiation oncologist who treated him for the recurrent prostate cancer, provided a letter explaining Mr. Reid's current health and his prognosis. Dr. Mokhtar estimates that a person with recurrent prostate cancer of Mr. Reid's age and with a similar history and medical condition would have a median survival of four to five years. He also recommends that Mr. Reid have access to cancer specialists to ensure the proper treatment of his recurrent cancer because a general practitioner would not have the skill or knowledge base to provide an adequate level of care. This letter is also attached as Exhibit 40.

Strictly applying the Sentencing Guidelines as reflected in the Presentence Report yields a prison sentence of 33 to 41 months.[5] These three years in prison potentially represent the majority of Mr. Reid's remaining four to five years of life, his median expectancy according to his Oncologist. Sending Asquith Reid to prison when he is suffering from recurrent cancer would also deny him medical treatment, which would tend to hasten his end.

It is a tragedy that Asquith Reid is here. It is a tragedy that he violated the law, even for a good purpose. But after a life such as he has lived, every day, helping others while depriving himself of what money could buy, the pleas of friends, relatives, neighbors and beneficiaries should be heeded. We do not seek a harsh justice, but mercy. In this case it is well warranted.

---

[5] Under defendant's analysis of the Guidelines, the prison term would be 15 to 21 months, but to be clear, the defendant's request is that the Guidelines be ignored and that 18 U.S.C. § 3553(a) be the standard.

## CONCLUSION

For the reasons set forth above a sentence of incarceration other than home confinement is not warranted and would not serve the interests of justice and would be "greater than necessary to comply with the purposes" of 18 U.S.C. § 3553.  Probation would be the most appropriate sentence given Mr. Reid's background and his health status.

Dated: New York, New York
       October 13, 2009

Respectfully submitted,

Baker & Hostetler LLP


By: _____
    John W. Moscow
    Brian K. Esser
    45 Rockefeller Plaza
    New York, New York 10111
    Phone: 212-589-4200
    Fax:  212-589-4201

*Attorneys for Defendant Asquith Reid*