UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x          <u>FILED VIA ECF</u>

UNITED STATES OF AMERICA          :
                                            S1 08 Cr. 331 (VM)
                                  :

        - v. -
                                  :

ASQUITH REID,
                                  :

            Defendant.
                                  :
- - - - - - - - - - - - - - - -x


<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>




                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for the United States
                                        of America.




RUA M. KELLY
Assistant United States Attorney
    - Of Counsel -

## TABLE OF CONTENTS

I.    Introduction . . . . . . . . . . . . . . . . . . . . 1

II.   Loss Amount  . . . . . . . . . . . . . . . . . . . . 2

III.  Abuse of Trust  . . . . . . . . . . . . . . . . . . 11

IV.   Section 3553(a) Factors  . . . . . . . . . . . . . 13

Conclusion  . . . . . . . . . . . . . . . . . . . . . . 15

## I.   Introduction

The Government respectfully submits this memorandum for the Court's consideration in connection with sentencing for defendant Asquith Reid, scheduled for Friday, December 18, at 3:30 p.m., and in response to the defendant's sentencing memorandum of October 13, 2009 (cited herein as "D. Br.").

On June 25, 2009, Reid entered a guilty plea to one count of conspiracy to commit mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1349, and one count of tampering with a witness, in violation of Title 18, United States Code, Section 1512(b)(1).  Although Reid admitted his guilt to the two federal crimes, he allocuted to a limited portion of the conduct alleged by the Government in the Indictment.  See Pre-Sentence Investigation Report ("PSR") at ¶37.  Specifically, Reid admitted only that he agreed with others to defraud the City of New York "by applying for contracts to receive money from the city using the mail" that falsely listed a "nominee" as the recipient of the funds, when in fact another unnamed individual was receiving that money.  Id.  In addition, the defendant admitted wiring $31,000 to his associates in Jamaica, W.I., and to instructing a witness to lie to the Government about her role in the crime.  Id.

In addition to his characterization of the offense conduct (which differs dramatically from the offense conduct described in both the Indictment and the PSR), Reid objects to the offense

-1-

level computation in the Presentence Report ("PSR"), contending
that the United States Probation Office ("Probation"): (1)
improperly enhanced his offense level by calculating the loss
amount as between $120,000 and $200,000 pursuant to §
2B1.1(b)(1)(F) of the United States Sentencing Guidelines (the
"Sentencing Guidelines" or "U.S.S.G."); and (2) improperly
applied the two-point enhancement for abuse of trust pursuant to
U.S.S.G. § 3B1.3.

For the reasons stated below, the Government respectfully
submits that the Court should adopt the findings of the PSR with
regard to loss amount and abuse of trust. Accordingly, the
Government respectfully submits that under the Sentencing
Guidelines, the adjusted offense level is 20 and the defendant's
criminal history category is I, resulting in a Guidelines range
of 33 to 41 months' imprisonment. The Government submits that a
sentence within the Guidelines range is reasonable and
appropriate under 18 U.S.C. Section 3553(a).

**II. The Loss Amount Attributable to the Defendant's Scheme Was
Between $120,000 and $200,000**

A.   <u>Relevant Facts</u>

At all times relevant to the Indictment, the defendant was
employed as the Chief of Staff to a member of the New York City
Council (the "Council Member"). Among his other duties, the
Council Member was responsible for allocating hundreds of
thousands of dollars annually to non-profit organizations serving

the community in his district.  Elected members of the Council
have traditionally had broad discretion to designate the non-
profits eligible to receive such funds (known as "discretionary
funds").  From June 2004 to April 2008, in his role as Chief of
Staff to the Council Member, Reid was the contact person for the
Council Member's requests for discretionary funds.  From April
2005 to April 2008, the Council Member allocated approximately
$356,000 in discretionary funds to the Donna Reid Memorial
Education Fund (the "Donna Reid Fund"), a non-profit organization
controlled by Reid[1] at all times relevant to the Indictment.

        In addition to the Donna Reid Fund, the Council Member also
directed discretionary funds to other non-profits controlled by
the defendant.  In or about July 2003, the Council Member
allocated funding to "Community Opportunity and Resource
Development" ("CORD").  At that time, the Council Member signed a
form recommending funding (the "Funding Form") that described
CORD's mission as: "People to do research, collect data, knock on
doors and collect information on resources, available to
children, seniors, and children's organizations, outreach to

---

[1] At the scheduled <u>Fatico</u> hearing, the Government expects to
adduce testimony from witnesses that Reid, at all times relevant
to the Indictment, managed the finances of the Donna Reid Fund,
submitted the fund's contracts to the City for approval, and had
sole possession of the checkbook for the bank account containing
all of the discretionary funds allocated to the Donna Reid Fund.
Moreover, the Government's witnesses will testify that as a
practical matter, Reid had exclusive decision-making authority
over all financial matters relative to the Donna Reid Fund.

[high school] seniors who do not avail themselves of services available [sic], match providers with recipients of children's services, promote the value of intergenerational relationship [sic]." The Funding Form listed the residential address of the defendant as the program address for CORD. In 2004, CORD received at least $14,500 in discretionary funds. In addition, in or about March 2006, the New York City's Department of Youth and Community Development ("DYCD") registered a contract allocating $35,000 in discretionary funding to an organization called "Central Brooklyn Community Services" ("CBCS"). CBCS was yet another non-profit organization designated by the Council Member to receive discretionary funding. According to documents submitted to the City of New York by CBCS, the program address for CBCS was the residence of the defendant.

Since April 2005, while some portion of the discretionary funds provided to the Donna Reid Fund appears to have been used for legitimate purposes, such as providing educational assistance to public school children, the defendant, and co-defendant Joycinth Anderson, embezzled at least $145,000 of the money. As described in more detail in the Indictment, Reid embezzled the funds in a variety of ways, including, but not limited to: (1) requesting a co-conspirator ("CC-1") to cash more than $51,000 in checks issued by the Donna Reid Fund; (2) requesting a co-conspirator ("CC-2") to cash more than $22,000 in checks issued

-4-

by the Donna Reid Fund; (3) requesting Anderson to cash approximately $20,000 in checks issued by the Donna Reid Fund; and (d) sending approximately $31,000 in Donna Reid Fund monies to individuals, including family members and friends, in Jamaica via Western Union wire transfers.

In addition to embezzling money from the Donna Reid Fund, Reid used CORD and CBCS – two non-profits that provided minimal, if any, services to the community – to funnel taxpayer money to his family and friends.  As the Government expects to prove at a <u>Fatico</u> hearing, CC-1 was listed in the contracts as the "Executive Director" of both CORD and CBCS, but had absolutely no knowledge of the services ostensibly being provided by CORD and/or CBCS.  Rather, CC-1's sole function was to sign official documents for CORD and CBCS, including batches of blank checks, at REID's direction.  Similarly, the individual listed in CBCS documents as the board president (the "Board President") never attended a CBCS board meeting, and did not know the other individuals listed as board members in official documents submitted by CBCS.  The Board President's sole responsibility for CBCS was to sign blank CBCS checks at REID's direction.

B.    <u>Applicable Law</u>

For the purposes of calculation of loss amount pursuant to U.S.S.G. § 2B1.1, subject to certain exclusions that are not relevant here, "loss is the greater of actual or intended loss."

-5-

U.S.S.G. § 2B1.1, cmt. 3(A).  Under the Sentencing Guidelines,
"actual loss" refers to "the reasonably foreseeable pecuniary
harm that resulted from the offense."  U.S.S.G. § 2B.1., cmt.
3(A)(i).  The term "intended loss" means "the pecuniary harm that
was intended to result from the offense" and "includes intended
pecuniary harm that would have been impossible or unlikely to
occur (e.g., as in a government sting operation, or an insurance
fraud in which the claim exceeded the insured value)."  U.S.S.G.
§ 2B1.1, cmt. 3(A)(ii).

In general, the loss amount attributable to a particular
defendant at sentencing includes all relevant conduct for which
that defendant is responsible.  According to U.S.S.G. § 1B1.3(a),
relevant conduct for sentencing purposes is assessed on the basis
of:

> (1)  (A) all acts and omissions committed,
>      aided, abetted, counseled, commanded,
>      induced, procured, or willfully caused
>      by the defendant; and
>
>      (B) in the case of a jointly undertaken
>      criminal activity (a criminal plan,
>      scheme, endeavor, or enterprise
>      undertaken by the defendant in concert
>      with others, whether or not charged as a
>      conspiracy), all reasonably foreseeable
>      acts and omissions of others in
>      furtherance of the jointly undertaken
>      criminal activity,
>
> that occurred during the commission of the
> offense of conviction, in preparation for
> that offense, or in the course of attempting
> to avoid detection or responsibility for that
> offense.

-6-

U.S.S.G. § 1B1.3(a).

Once a defendant's relevant conduct is determined, the sentencing court must then make a "reasonable estimate of the loss" for the defendant's offense given the "available information."  See U.S.S.G. § 2B1.1, cmt. 3(C).  The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." United States v. Bryant, 128 F.3d 74, 75 (2d Cir. 1997); see also United States v. Singh, 390 F.3d 168, 192 (2d Cir. 2004) (stating that for Guidelines purposes, "[a] reasonable estimate of the loss is all that is necessary").

C.   Discussion

The Government submits that the loss amount has been properly calculated in the PSR.  Moreover, the defendant evidently does not contest the accuracy of the bank records (which were attached to his brief as an exhibit), and those bank records include virtually all of the financial transactions described in the Indictment that benefitted Reid and his associates.  In total, Reid embezzled approximately $145,000 from the Donna Reid Fund, and $48,000 from CORD and CBCS, for a total of $193,000[2] – well within the applicable loss amount category.

---

[2] Even if the Court were to reduce the total loss amount by $21,000 as the defendant proposes, to reflect Reid's eventual repayment of monies spent on a political event and campaign literature, the loss amount would total $171,000 – a number well in excess of the $120,000 threshold.

Moreover, this Court should reject the defendant's argument that the loss amount should be reduced by $100,000, based on the defendant's bare assertion that he invested that amount of his own funds into the Donna Reid Fund.  In essence, the defendant asks this Court to ignore the factual findings set forth in the PSR as to the facts and circumstances of the offense, and simply accept the defendant's self-serving statement at face value.

Indeed, the Government is prepared to present witnesses and testimony at a <u>Fatico</u> hearing[3] to prove that the defendant embezzled between $120,000 and $200,000 from the Donna Reid Fund, and that his conduct was not limited, as he asserts in his brief, to "hir[ing] an undocumented person whose identity he had to conceal, with the attendant deceits about the money flow."  D. Br. at 21.  By contrast, the evidence will show that Reid misdirected city funds from three non-profit organizations, including the Donna Reid Fund, for the benefit of his friends and family over the course of several years, and his conduct was not limited to a single misstatement as to "the identity of a contractor" for the Donna Reid Fund.  D. Br at 22.

A few examples of the criminal conduct illustrate that the crime was not as limited in nature as Reid claims.  First, the

---

[3]  The parties continue to discuss the parameters of the <u>Fatico</u> hearing, and expect to resolve at least certain of the contested issues via stipulations of testimony.

Government proffers that CC-1[4] would testify that CC-1 learned from Reid that the non-profit organization Central Brooklyn Community Services ("CBCS") was a community-based organization. Reid then listed CC-1 as the Executive Director of CBCS in documents submitted to the City of New York.  However, CC-1 would testify that s/he had no idea what kind of services CBCS provided – or whether they provided services at all – and had no decision-making authority over CBCS.  Rather, CC-1 simply signed batches of blank checks given to CC-1 by Reid.  In total, CC-1 endorsed at least approximately $25,000 in CBCS checks.  CC-1 would testify that s/he trusted Reid because of his role as a leader and activist in Brooklyn and believed that he was working on behalf of the community.  Similarly, CC-1 cashed approximately $54,000 in checks from the Donna Reid Fund and turned the majority of it over to Reid in the form of cash.  CC-1 would receive the checks at the district office of the Council Member, cash them at a nearby bank, and return to the district office with an envelope of cash for the defendant.

Reid also embezzled an additional $22,000 in funds through CC-2,[5] whose spouse was then employed by the Council Member.  In

---

[4] CC-1 has entered a guilty plea in connection with his/her conduct in connection with this Indictment, and would be testifying at the <u>Fatico</u> hearing pursuant to a cooperation agreement with the Government.

[5] CC-2 is expected to testify pursuant to a non-prosecution agreement with the Government.

early 2006, CC-2 would testify that Reid asked CC-2 to  meet him at the Council Member's office.  During the ensuing meeting, Reid told CC-2 that the Donna Reid Fund lacked sufficient funding to pay its employees, and asked CC-2 to cash checks for Reid so that he could pay the employees.  CC-2 agreed to cash checks for Reid. On multiple occasions during the next several months, Reid gave CC-2 checks written to him/her from the Donna Reid Fund.  CC-2, in turn, deposited each check, waited for each check to clear, and then returned to the Council Member's office, where s/he gave Reid cash representing proceeds for each check.

As CC-2 would testify, CC-2 never worked for the Donna Reid Fund.  Indeed, CC-2 knew very little about the Donna Reid Fund, except that it was involved in immigration and after-school programs, and that it operated out of 1738 Nostrand Avenue in Brooklyn.  Moreover, CC-2 admitted that nearly everything s/he initially told the Government about the Donna Reid Fund during a meeting was a false account provided by the defendant.[6]

Finally, the defendant proffers no evidence that the loss amount is less than $120,000, other than the bare assertion that he contributed "at least $100,000 to the Fund – money for which

---

[6] CC-2 was served with a subpoena to testify in this matter January 2008.  Soon thereafter, Reid approached CC-2 and told CC-2 to tell prosecutors that she worked for the Donna Reid Fund's after-school program, and in that capacity she cared for approximately three or four children during specific hours.  He also told CC-2 to deny that s/he ever gave the defendant cash.

-10-

he is entitled to be reimbursed." The Government is prepared to introduce the bank records for the Donna Reid Fund, as well as other relevant financial records, to assist the Court in evaluating the defendant's claim. However, these records – which were produced to the defendant in discovery, and are attached to his sentencing brief – are uncontroverted. Accordingly, since the defendant can point the Court to no witnesses and no documents to support his claim, the Government submits that the Court should accept the factual findings set forth in the PSR.

In sum, as the Government is prepared to prove at a <u>Fatico</u> hearing, the loss amount attributable to Reid is more than $120,000, and his offense level should be enhanced by 10 levels, pursuant to U.S.S.G. § 2B17.1(b)(1)(F).

**III. The Defendant Abused the Public Trust In Committing This Crime**

Under the U.S. Sentencing Guidelines, a sentencing enhancement pursuant to § 3B1.3 is warranted when a defendant, "in a manner that significantly facilitated the commission or concealment of [an] offense," either: (1) "abused a position of public or private trust," or (2) employed "a special skill." U.S. Sentencing Guidelines Manual § 3B1.3 (2008). The commentary to § 3B1.3 defines a position of "public or private trust" as a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily

-11-

given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.1 (2008).

The Second Circuit has "held that the 'primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'" United States v. Fong, 2009 U.S. App. LEXIS 2448, at *5-6 (2d Cir. Feb. 9, 2009) (quoting United States v. Laljie, 184 F.3d 180, 194 (2d Cir. 1999)).  In addition, it has held that the "defendant's position must involve discretionary authority . . . [and that] this discretion must have been entrusted to the defendant by the victim." United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001).

Reid argues against the application of this enhancement because "his creation of the Donna Reid Fund and CBCS from which he is accused of misappropriating funds, had no relation to his position as the Council Member's Chief of Staff."  Reid submits that because of his position as a respected leader and activist in the district, the Council Member ("of course") would have endorsed such a request for discretionary funds from Reid.

The defendant, however, was the Council Member's Chief of Staff, and was – as any staff member in the Council Member's

-12-

office would certainly testify -- extremely influential on all
matters occurring in the office.  Moreover, Reid was both a high-
level employee with supervisory responsibility for the office of
a public official <u>and</u> a person who (in his "private" capacity)
simultaneously submitted requests to that public official for the
Donna Reid Fund.  Once the funds were designated, the defendant
had sole responsibility for managing the hundreds of thousands of
dollars in taxpayer funds allocated by the Council Member to that
organization.  Defense counsel's argument thus misses the point.
The fact that the defendant did not have ultimate authority over
the discretionary funding does not remove him from the category
of public employees subject to the "abuse of trust" enhancement.
<u>See</u> <u>also</u> <u>United States</u> v. <u>Friedberg</u>, 558 F.3d 131, at *13 (2d
Cir. 2009) (finding the defendant's abuse of his position of
trust to embezzle funds victimized both his employer and the
government); <u>United States</u> v. <u>Echevarria</u>, 33 F.3d 175, 180-181
(2d Cir. 1994) (holding that government, insurance companies and
patients were victims of defendant who posed as a doctor and
fraudulently collected payments for medical services).

## VII. Section 3553(a) Factors

In determining a reasonable sentence, the sentencing judge
is required to consider the factors set forth at 18 U.S.C.
§ 3553(a).  These factors include, among others, the nature and
circumstances of the offense; the history and characteristics of

-13-

the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need for deterrence and to protect the public from further crimes of the defendant.  See 18 U.S.C. § 3553(a).

Under Section 3553(a)(1), the sentencing court must first consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Section 3553(a)(2)(A) sets forth a related proposition that the sentence should "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense."

The defendant seeks leniency based, inter alia, on his many decades of public service, both as a political activist and as a community leader, as described in the dozens of letters submitted by friends, family and former colleagues.  Certainly, this Court must consider the history and characteristics of the defendant in fashioning an appropriate sentence, including the defendant's lengthy involvement in serving the people of East Flatbush.

However, the Court must also consider other dimensions of Reid's life, including his criminal conduct in this case.  While the letters present the defendant as a man committed to social justice, Reid's criminal conduct included his directing a grand jury witness to lie to the Government about paying him thousands

-14-

of dollars in cash.  His admission thus casts a very different
light on the defendant, who in fact attempted to obstruct justice
in this case.  In addition, while the letters portray Reid as a
person dedicated to helping others, Reid's conduct in this case
resulted in thousands of dollars allocated to helping school-age
children in East Flatbush being diverted to his family and
friends.  Reid's actions here were thus inapposite to the values
of the person described in the letters submitted on his behalf.

### **Conclusion**

For the reasons set forth above, the Government submits
that, based on the factors set forth in Section 3553(a), a
reasonable and appropriate sentence is a sentence within the
applicable advisory guidelines range.  The Government also
respectfully submits that such a sentence is not greater than
necessary to fulfill the foregoing sentencing factors enumerated
in Section 3553(a).

Dated:     New York, New York
           November 12, 2009

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney

                    By:   _____
                          Rua M. Kelly
                          Assistant United States Attorney
                          (212) 637-2471

-15-